ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. A jury in the Jasper County Circuit Court convicted Robert T. Dubose of three counts of gratification of lust under Mississippi Code Annotated section 97-5-23(1) (Rev.2006).
 
 [1]
 
 Dubose was sentenced to serve ten years for each count, with each sentence to run consecutively for a total of thirty years, in the custody of the Mississippi Department of Corrections (MDOC). Dubose filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion, and Dubose filed the instant appeal. Dubose raises the following three issues: (1) the trial court erred in denying his motion for a new trial based on the misconduct of a juror; (2) the trial court erred in accepting the race-neutral reasons given by the State, regarding six African American jurors, after he raised a
 
 Batson
 
 objection; and (3) the trial court erred in denying his motion for a new trial because the verdict is against the overwhelming weight of the evidence. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. Dubose and his wife, Mary Dubose (Mary), were married in 2000, and several years later, they adopted three children, C.D., L.D., and A.D.
 
 [2]
 
 Mary testified that
 
 *344
 
 the children lived with them for a few years prior to the adoption. In March 2006, due to congestive heart failure, Mary was hospitalized for nearly a week. On March 22, 2006, Lyrita Moffit-Parker, an employee of the Jasper County Department of Human Services, received a report of alleged sexual abuse against C.D., L.D, and A.D. At that time, the children were ages nine, eight, and six, respectively. Parker testified that she went to the children’s school and interviewed all three children individually. Parker further testified that each child told her of numerous episodes of fondling and sexual battery
 
 [3]
 
 committed by Dubose.
 

 ¶ 3. The children told Parker that the incidences of touching and sexual battery happened when Mary was absent from the home. Pursuant to an order issued by a youth court judge, the children were removed from Dubose’s home on March 22, 2006. About a week later, each child was examined by Dr. Patricia Tibbs, a pediatrician in Ellisville, Mississippi.
 

 ¶ 4. At trial, the three children described incidences wherein Dubose either touched them unlawfully or committed sexual battery upon them. C.D. testified that one evening while L.D. and A.D. were sleeping and Mary was away from their home, Du-bose asked her “if she wanted to have fun,” but she told him “no sir.” She went on to testify that a while later, Dubose returned and had her go to his bedroom and remove her “bottom” clothes. She further testified that he then “put his hand on [her] ‘private parts’,” and he had her put her leg over his leg. She stated that he then had her hold his penis, and he digitally penetrated her vagina. When asked, at trial, what threats, if any, were ever made by anyone, C.D. responded that “[Dubose] said that he would beat us to death if we tell [sic].”
 

 ¶ 5. Also, L.D. testified that one night while Mary was in the hospital, Dubose had her go to Dubose and Mary’s bed and remove her clothes. L.D. stated that Du-bose then touched her breasts and her “private part” with his hand. When asked whether she was ever threatened, L.D. responded that Dubose told her “[they] was [sic] going to get a beat down,” if she told anybody about the incident.
 

 ¶ 6. A.D., the last child to testify, described multiple incidences wherein Du-bose touched him unlawfully. A.D. stated that Dubose would kiss him and/or penetrate A.D.’s anus with either his hand or “private part.” A.D. also testified that Dubose had him touch Dubose’s “private part” with his mouth. C.D. and L.D. both testified that, at separate times, they each witnessed Dubose molest A.D. The children testified that the episodes of sexual abuse by Dubose against A.D. happened in either A.D.’s room or Dubose and Mary’s room. C.D. and L.D. testified that they peeked into the rooms through a curtain or slightly-opened door.
 

 ¶ 7. The record reflects that the testimony the children gave at trial was much the same as they told Parker and Dr. Tibbs.
 
 *345
 
 Dr. Tibbs testified that her examinations of the children revealed the children had physical injuries, which were healing, but were consistent with the account given by them. However, in response to cross-examination questions, Dr. Tibbs acknowledged that she could not rule out the possibility that some of the injuries could have been caused by something other than sexual battery. Specifically, A.D.’s anal fissures, or tears, could have been caused by constipation. But, Dr. Tibbs maintained that, despite the possibility, the tears were consistent with A.D.’s stated history of sexual abuse. Dr. Tibbs also testified that she found physical evidence that L.D.’s vagina had been sexually penetrated because L.D. had indicia of a healed tear of her hymen.
 
 [4]
 
 After deliberating about an hour, the jury found Du-bose guilty of three counts of gratification of lust. On March 3, 2008, Dubose was sentenced to serve a total of thirty years in the custody of the MDOC. From his conviction and sentence, Dubose files this appeal.
 

 I. WHETHER THE TRIAL COURT ERRED IN DENYING DUBOSE’S MOTION FOR A NEW TRIAL BASED ON THE MISCONDUCT OF A JUROR.
 

 ¶ 8. Dubose claims that he was denied a fair and impartial jury because juror number 8, Michael E. Thigpen, failed, during voir dire, to disclose his relationship to Dubose’s wife, Mary. According to Dubose’s brief to this Court, Thigpen was related to Mary’s ex-husband, Quillie McDonald (McDonald).
 
 [5]
 
 For resolution of this issue, we consider the following:
 

 Where a prospective juror in a criminal case fails to respond to a question by defense counsel on voir dire, the [cjourt should determine whether the question was (1) relevant to the voir dire examination, (2) whether it was unambiguous, and (3) whether the juror had substantial knowledge of the information sought to be elicited. If all answers to the above questions are affirmative, then the court determines if prejudice to the defendant in selecting the jury could be inferred from juror’s failure to respond.
 

 Barker v. State,
 
 463 So.2d 1080, 1083 (Miss.1985). The record reveals that the questions presented during voir dire were relevant questions, and they were not ambiguous. Therefore, we look at the third factor: whether Thigpen had substantial knowledge of the information sought. We also determine whether prejudice during the jury selection can be inferred.
 

 ¶ 9. Dubose claims that Yolanda Street-er, daughter of Mary and McDonald, confronted juror Thigpen about his recognition of, or relationship with, Mary after voir dire of the prospective jurors. Du-bose states, “it is believed that Thigpen simply smiled in response.” According to Dubose, Streeter did not disclose this interaction between her and Thigpen, at the time of the trial, because she did not want to get Thigpen in trouble for failing to reveal his relationship to Mary’s ex-husband. ' In determining whether Thigpen had substantial knowledge of the information sought, we consider the record of the voir dire proceedings.
 

 ¶ 10. The record reveals that Thigpen readily acknowledged he recognized Streeter, Mary’s daughter and potential
 
 *346
 
 witness. As well, he stated that Streeter’s husband was his classmate.
 
 [6]
 
 The following transpired during voir doire:
 

 [Defense attorney]: I believe we already went through Mary Dubose, who will be one of the defense witnesses. Yolanda Streeter ..., if you would, please stand up.
 

 [Defense attorney]: Yolanda is a potential defense witness, as well. Does anybody here know Yolanda Streeter?
 

 [[Image here]]
 

 [Defense Attorney]: Number 8 [Thig-pen]?
 

 [Thigpen]: Her husband is my classmate.
 

 [Defense attorney]: Her husband is your classmate? Okay. Does that fact influence you one way or the other? Do you know her personally, or do you just know her husband as your classmate? [Thigpen]: I know of her. I don’t know her personally.
 

 ¶ 11. Additionally, Thigpen and the ve-nire were questioned by the trial judge as to their willingness to determine a verdict based only upon the testimony and exhibits presented at trial. The record reflects the following:
 

 Court: Under the law, you’re to decide this case based on two things and two things alone. That is the evidence which will come to you in the form of oral testimony from the witness stand and the physical articles that we call exhibits that you’ll be allowed to pass among yourselves and examine.
 

 And secondly, the law, which will be read to you at the conclusion of the testimony but prior to the closing statements of the attorneys. Now, I told you that in order to ask you this: Can each of you decide this case based on those two things and those two things alone?
 

 Jury: (no verbal response.)
 

 Court: Is there anyone who cannot do so?
 

 Jury: (No verbal response.)
 

 Court: Is there anything on your mind you feel you should make known to the parties, the attorneys or the [c]ourt which might affect your ability to be a fair, impartial, and attentive juror throughout the trial of this case?
 

 Jury: (No verbal response.)
 

 ¶ 12. Thigpen indicated that he would not be influenced by the fact that he knew one of the witnesses or their spouse, and he would make a decision based upon evidence presented at trial. During jury selection, neither the State nor the defense questioned the attentiveness of Thigpen during voir dire or challenged him as a juror. Furthermore, Mary did not recognize Thigpen. In his brief to this Court, Dubose acknowledges that “Mary Dubose did not recognize Thigpen as McDonald’s cousin at the trial[ ] and only learned of his identity on February 27 or 28, 2008.” Possibly Mary did not recognize Thigpen because, according to her testimony, she had been divorced from McDonald for about twenty years at the time of the trial. Mary was the only witness for the defense, and her testimony primarily consisted of her stating that the children never told her of any abuse. And, she stated the only time she was away from the children or their home was while she was in the hospital during March 2006. Dubose did not testify at trial, nor did Streeter.
 

 ¶ 13. As mentioned, Thigpen readily revealed that he “knew of’ Streeter because her husband was his classmate. Dubose has offered no motive that Thigpen may have had for not acknowledging a possible familial relationship with McDonald or how
 
 *347
 
 he was prejudiced and denied a fair trial. Given that Thigpen readily acknowledged he recognized Mary’s daughter, who was presented at trial as a possible witness, it stands to reason, he would have been forthcoming about any other knowledge he may have had concerning Mary and her ex-husband.
 

 ¶ 14. Following the trial, Dubose filed three motions for a judgment notwithstanding the verdict or, in the alternative, for a new trial. Both Thigpen and Street-er were subpoenaed to appear and testify concerning Thigpen’s relationship to McDonald. However, the record indicates that service of process was never completed. A hearing on Dubose’s motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial was held on August 26, 2008, and Dubose’s motion was denied. The record does not indicate whether Streeter or Thigpen were present to testify concerning this matter. After carefully examining the record, we are satisfied that there is neither any inference that Dubose was prejudiced during jury selection and denied a fair trial, nor do we find that the trail court committed reversible error in declining to grant a new trial on this ground. This issue is without merit.
 

 II. WHETHER THE TRIAL COURT ERRED IN ACCEPTING THE RACE-NEUTRAL REASONS GIVEN BY THE STATE, REGARDING SIX AFRICAN AMERICAN JURORS, FOLLOWING A
 
 BATSON
 
 OBJECTION.
 

 ¶ 15. Dubose next contends that the State used all six of its peremptory strikes to eliminate six African Americans from the venire for racially-motivated reasons. He argues that the reasons offered by the State, following his
 
 Batson
 
 objection, were merely pretextual. Dubose claims that the State “clearly engaged in disparate treatment[,] and the reasons for striking the jurors were insufficient.” We disagree.
 

 ¶ 16. “Under
 
 Batson,
 
 the party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike.”
 
 Finley v. State,
 
 725 So.2d 226, 239(¶ 59) (Miss.1998) (citing
 
 Batson v. Kentucky,
 
 476 U.S. 79, 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). The burden then shifts to the party exercising the challenge to offer a race-neutral explanation for striking the potential juror, and the trial court then determines if the peremptory strike was offered for purposeful discrimination.
 
 Id.
 
 at 240(¶ 59) (citation omitted).
 

 ¶ 17. If the trial court accepts the prosecutor’s race-neutral reasons for a strike, our standard of review of the trial court’s decision is as follows:
 

 This Court accords great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason. This Court will not reverse a trial judge’s factual finding on this issue unless they appear clearly erroneous or against the overwhelming weight of the evidence. One of the reasons for this is because the demeanor of the attorney using the strike is often the best evidence on the issue of race-neutrality.
 

 Le v. State,
 
 913 So.2d 913, 926(¶ 26) (Miss.2005) (internal citations and quotations omitted). However, despite our deferential standard of review, we remind our trial courts that a facially race-neutral explanation for a peremptory challenge
 
 should never be sufficient, standing alone,
 
 to meet a
 
 Batson
 
 objection.
 
 Batson
 
 requires more.
 
 Batson
 
 mandates that the trial judge determine whether the facially race-neutral reason is in fact a pretext for
 
 *348
 
 purposeful discrimination: a “smokescreen,” if you will.
 

 ¶ 18. The trial judge should consider: the racial composition of the venire panel summoned and qualified to serve, the racial composition of the potential jurors actually considered for jury service in the case, and the racial composition of the jurors and alternates who actually served. Without such consideration, it is extraordinarily difficult, if not impossible, for either the trial judge or an appellate court to determine if a stated race-neutral reason is pretextual, regardless of whether it is presented by the prosecution or the defense. Situations may occur wherein an attorney may use all of his or her peremptory strikes to excuse jurors of only one race without it indicating racial motivation. For instance, when the racial composition of the jurors under consideration is ninety percent one race, it is not as likely there will be a heightened sense of racially-motivated pretext when a party strikes six jurors of that same race since nine out of every ten jurors under consideration by the proponent of the race-neutral reason would be of the same race. It is quite another situation where a party uses all six of his or her peremptory strikes to excuse jurors of only one race leaving no, or few, remaining jurors of that same race on the panel. A trial judge must consider the entire voir dire proceedings, and all of the inherent facts therein, when considering claims of racially-motivated peremptory strikes.
 

 ¶ 19. The supreme court has recognized the potential to manipulate voir dire proceedings in order to eliminate prospective jurors solely on the basis of race. In
 
 Flowers v. State,
 
 947 So.2d 910, 937(¶ 69) (Miss.2007), Justice Graves speaking for the supreme court, stated the following:
 

 Because racially-motivated jury selection is still prevalent twenty years after
 
 Batson
 
 was handed down ... we agree that it is necessary to reconsider
 
 Bat-son’s
 
 test and the peremptory challenge system as a whole. While the
 
 Batson
 
 test was developed to eradicate racially discriminatory practices in selecting a jury, prosecuting and defending attorneys alike have manipulated
 
 Batson
 
 to a point that in many instances the voir dire process has devolved into an exercise in finding race[-]neutral reasons to justify raciallyH motivated strikes. When
 
 Batson
 
 was handed down, Justice Marshall predicted that[:] Merely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge. Unfortunately, ... Justice Marshall was correct in predicting that this problem would not subside. His solution to this problem was to ban peremptory challenges outright, a position later advocated by Mississippi Supreme Court Justice Michael Sullivan.
 

 (Internal citations and quotations omitted). We are aware that making the determination whether a stated race-neutral reason is pretextual may be the equivalent of attempting to discern someone’s thoughts and heart. However, as long as the peremptory-challenge system remains, a determination of pretext must be made.
 

 ¶ 20. We commend our trial judges and recognize they are in a uniquely-advantageous position to make this call because they are present in the heat of the battle and can observe and sense the true motivations of the proponent from all the relevant surrounding circumstances. However, we urge our trial judges and attorneys to make and furnish an adequate record from which an appellate court may fully analyze the voir dire proceedings. As mentioned, without information relating to
 
 *349
 
 the entire racial and/or gender composition of the venire and the petit jury, it is extraordinarily difficult, if not impossible, for an appellate court to declare the trial judge’s decision clearly erroneous or against the overwhelming weight of the evidence. Our research of the record in the instant case has not revealed the racial composition of the venire panel or the jury. With that limitation, we now consider the race-neutral reasons given by the State for striking six African Americans from the jury, and we evaluate them according to precedent and facts that are apparent from the record.
 

 ¶ 21. First, at trial, Dubose claimed that Juror No. 4, Johnny Pierce, was excluded without the State giving a race-neutral reason. The State responded that “Mr. Pierce was wanting to get off the panel, Your Honor. And[,] he was not attentive when I was talking with him. And[,] ... he was looking the other way. Just his attitude and his inattentiveness, Your Honor.” The trial judge stated that “inattentiveness is a legitimate reason, [s]o I’ll allow that strike.” The trial judge was correct: “Inattentiveness alone has been accepted as a race-neutral explanation for the exercise of a peremptory strike.”
 
 Hicks v. State,
 
 973 So.2d 211, 220(¶ 28) (Miss.2007).
 

 ¶ 22. Second, Juror No. 9, Makita Jones, was excluded by the State because she failed to respond to the State’s question of whether any jurors or any member of their family had sexual allegations lodged against them. The State attempted to have Jones struck for cause because, after voir dire, Parker informed the State that, at one time, Jones’s husband had been accused of molestation. The defense counsel objected to striking her for cause because the conversation between Parker and the State’s counsel occurred off the record and was irrelevant unless Jones was questioned on the record about the matter. The trial judge responded that “it [was] certainly good grounds for a peremptory challenge.” Following the State’s race-neutral reasons for striking Jones, the defense counsel made no response, and the trial judge found the reason to be both race and gender neutral.
 

 ¶ 23. The likelihood that Jones would have possessed bias due to possible allegations against her husband for the same crime with which Dubose was charged was undoubtedly a race-neutral reason for striking Jones. As well, she would have likely been excused for cause had further questioning verified Parker’s statement to the State, which was that Jones’s husband had indeed been accused of molestation. Given the presumed prejudice for withholding this type of information, we find no error in the trial judge’s acceptance of the State’s race-neutral reason. Furthermore, at trial, the defense counsel offered no further challenge to the State’s use of a peremptory strike to excuse Jones from the jury panel.
 

 ¶ 24. Third, Juror No. 14, Robert Magee, was struck because he “showed more attentiveness to [the defense counsel],” and he knew Streeter and her husband. The defense counsel responded that the State had already accepted a juror that knew Streeter and her husband, which was Thigpen, and argued that a juror paying more attention to him instead of the State’s counsel was not a race-neutral reason. The State responded that, in addition to those reasons, there had been several arrests in the Magee family. The trial judge stated that he would allow it, but he would reconsider it later, if he found out that it was improper to accept a juror who knew the same witness as a juror that was rejected, and that was the sole reason. However, the trial judge recognized that the State had assigned other reasons than
 
 *350
 
 Magee’s mere knowledge of Streeter, so on the whole, he determined that they were race-neutral reasons.
 

 ¶ 25. “Reasons this Court has accepted as race-neutral include being single with children, having short-term employment, and having a friend or family member charged with a crime.”
 
 Pruitt v. State,
 
 986 So.2d 940, 945(¶ 17) (Miss.2008) (citing
 
 Magee v. State,
 
 720 So.2d 186, 188—89(¶ 9) (Miss.1998)). Additionally, this Court has held that living in an area of “high crime” is an acceptable, race-neutral reason.
 
 Id.
 
 (Citing
 
 Lynch v. State,
 
 877 So.2d 1254, 1271-72(¶ 51) (Miss.2004)). Based upon
 
 Pruitt
 
 and
 
 Lynch,
 
 there was no error in the trial judge’s acceptance of the State’s race-neutral reasons of Magee’s family’s history with law enforcement and Magee’s inattention during questioning.
 

 ¶ 26. Fourth, Juror No. 17, Bobby Chapman, was struck because several members of his family had been arrested by the Jasper County Sheriffs Department, and Chapman, himself, was known by the sheriff because of his family’s prior “run-ins” with law enforcement. The defense counsel found the reason to be “guilt by association” and; therefore, it was not a racial-neutral reason. The trial judge stated that he recalled that the supreme court had held that arrests "within a family of prospective jurors was a race-neutral reason. Based upon
 
 Pruitt,
 
 stated above, we find no error in the trial judge’s decision.
 

 ¶ 27. Fifth, Juror No. 21, Mack A. Holder, Jr., was struck because: he, too, had family members who had been arrested; he and his family were known by law enforcement; and the State believed that Holder had been arrested as well. The defense counsel responded, once again, that it was guilt by association, and there was no proof that Holder himself had been arrested. For the same reasons set forth for jurors Chapman and Magee, we find no error in the trial judge’s decision to find the State’s reasons to be race-neutral.
 

 ¶ 28. Sixth, Juror No. 24, Mary Anne Barnett, was struck because she knew Dubose from church services, where he played the organ. There was some dispute as to whether she actually attended the same church as Dubose. However, during voir dire, she stated that she “[saw] [Dubose] at church.” The trial judge found “the mere fact that she saw him [was] sufficient for a peremptory strike.”
 

 ¶ 29. Similarly, in
 
 Council v. State,
 
 976 So.2d 889, 897(¶ 12) (Miss.Ct.App.2007), the defendant argued that the exercise of a peremptory challenge against a juror because the juror attended church with the defense counsel was not in violation of
 
 Batson.
 
 In
 
 Council,
 
 this Court acknowledged that the record did not verify that the juror actually attended the same church as the defense counsel, but we determined that a peremptory challenge based upon the family friendship with the defense counsel was not in violation of
 
 Batson. Id.
 
 However, the error caused from the improper exclusion of the prospective juror was found to be harmless.
 
 Id.
 
 Accordingly, we find any error in the acceptance of the State’s race-neutral reason for striking juror Barnett was harmless.
 

 ¶ 30.
 
 “Batson
 
 was originally intended to prevent racial discrimination in the use of peremptory challenges during jury selection by the State. The application of
 
 Bat-son
 
 has since been expanded in scope several times and now extends to, among other things, the use of peremptory challenges by criminal defendants.”
 
 Parker v. State,
 
 5 So.3d 458, 462(¶ 14) (Miss.Ct.App.2008) (citing
 
 Georgia v. McCollum,
 
 505
 
 *351
 
 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)).
 

 ¶ 31. Dubose used all six of his peremptory strikes to eliminate Caucasian jurors. Following a
 
 McCollum
 
 objection by the State, Dubose offered many of the same race-neutral reasons as the State had: namely, inattentiveness and knowledge of potential witnesses. Based upon the juror’s names, it appears that the selected jurors consisted of eight females and four males, and, as stated, the record does not reflect the overall composition of the jury as to race. After thoroughly studying the record and applicable case law, we find that Dubose failed to meet his burden of proving purposeful discrimination, and we find that the trial judge’s rulings on the
 
 Batson
 
 challenges were neither clearly erroneous nor against the weight of the evidence. This issue is without merit.
 

 III. WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
 

 ¶ 32. Dubose contends that “at a minimum [he] is entitled to a new trial as the verdict is against the overwhelming weight of the evidence.” He argues that “there was almost no evidence that Dubose sexually assaulted any of the children.” We disagree. This Court sits as a “thirteenth juror” when determining whether a jury verdict is against the overwhelming weight of the evidence.
 
 Jenkins v. State,
 
 947 So.2d 270, 278(¶ 24) (Miss.2006). We must accept as true the evidence which supports the verdict, and we will reverse only when convinced that the trial court abused its discretion in failing to grant a new trial.
 
 Id.
 
 (citing
 
 Baker v. State,
 
 802 So.2d 77, 81(¶ 14) (Miss.2001)). Sitting as the “thirteenth juror,” we now recap some of the evidence presented to the jury.
 

 ¶ 33. In graphic detail, all three children testified that Dubose had touched them with either his hands, mouth, and/or penis. A.D. and C.D. testified that Dubose had committed both oral and anal sex upon A.D., and the children testified that Du-bose had sexually battered both C.D. and L.D. All three children stated that the touching and assaults occurred when Mary was gone from their home and/or in the hospital. Parker, a twenty-year veteran with the Jasper County Department of Human Services, testified that she received a report of alleged sexual abuse against the three children on March 22, 2006. Mary testified that she was in the hospital in March 2006 for nearly a week.
 

 ¶ 34. Parker further testified that she interviewed all three children individually at their school, and after the children’s account of the events stated above, she sought a hearing before a youth court. The children were removed from the home, and they were later taken to Dr. Patricia Tibbs, a pediatrician, in Ellisville, Mississippi. Dr. Tibbs testified that all three children had injuries consistent with the children’s account of sexual abuse.
 

 ¶ 35. The jury heard that L.D.’s hymen had indicia of vaginal penetration, and that A.D. had two anal fissures that were healing. Dubose attempts to discount Dr. Tibb’s testimony by asserting that she only testified as to whether a sexual battery occurred, not to an unlawful touching. This is unpersuasive given that it is improbable that a sexual battery would have occurred in the absence of an unlawful touching. “The lustful touching of a child under fourteen is not necessarily a lesser
 
 [-^included
 
 offense of statutory rape. Lustful touching is, however, a lesser[-]related offense.”
 
 Branch v. State,
 
 998 So.2d 411, 417(¶ 27) (Miss.2008) (internal citations and quotation omitted). Although Dubose was neither indicted nor
 
 *352
 
 convicted of statutory rape, the supreme court’s analysis regarding lustful touching and statutory rape is analogous to lustful touching and sexual battery. The record indicates that both Dr. Tibb’s and Parker’s reports and testimonies corroborated the children’s rendition of what occurred.
 

 ¶ 36. Dubose emphasizes that A.D.’s testimony regarding the number of times Dubose touched and/or sexually assaulted him varied from the testimony given by A.D. and C.D. In response to the defense attorney’s questions, such as “did this happen more than twenty times?” or “did this happen more than forty times?,” A.D. said that it happened up to one hundred times. On redirect, A.D. testified that it happened more than five times. A.D. was about six years old when the episodes occurred, and it had been approximately two years by the time of the trial. Credibility of A.D.’s testimony and consideration of his tender age was a fact for the jury to weigh.
 

 ¶ 37. “Mississippi courts generally allow children of tender years to testify if competent.”
 
 Mohr v. State,
 
 584 So.2d 426, 431 (Miss.1991). “Rule 601 of the Mississippi Rules of [E]vidence provides that every person is competent to be a witness unless they are incompetent or otherwise restricted.”
 
 Id.
 
 “It is in the sound discretion of the trial judge to determine the competency of a child witness.”
 
 Id.
 
 After studying AD.’s testimony and the record, we find that he was a competent witness. He exhibited the ability to understand and answer questions; he remembered events; and his testimony was consistent with the statements he had made previously to Parker and Dr. Tibbs.
 

 ¶ 38. Dubose asserts that the jury did not find him guilty of sexual assault, and he argues that “[i]f the alleged victims were credible as to their allegations of fondling, then there [was] no reasonable basis for a jury to conclude that they were not credible as to their allegations of sexual assault.” We interpret this to mean that Dubose argues the verdicts were inconsistent. Although we disagree, we note that: “[I]nconsistent or even contradictory verdicts are not, in and of themselves, reasons to overturn a criminal conviction.”
 
 George v. State,
 
 752 So.2d 440, 443(¶ 20) (Miss.Ct.App.1999). As shown above, Mississippi Code Annotated section 97-3-95 requires sexual penetration in order to convict a defendant of sexual battery. Sexual penetration is not required to prove an unlawful touching. During deliberations, the jury sent a note to the trial judge asking the judge the following question: “Define sexual penetration in reference to sexual battery.” The trial judge responded that the law did not permit him to instruct them at that point in time. The fact that the jury did not find Dubose guilty of sexual battery does not vitiate the evidence as to touching. It simply means that the jury was discerning and did not find sufficient evidence to support the sexual battery charges. “The jury is the sole judge of the weight of the evidence and the credibility of the witnesses.”
 
 Nix v. State,
 
 8 So.3d 141, 146(¶ 26) (Miss.2009) (citing
 
 Mohr,
 
 584 So.2d at 431). Furthermore, an independent appellate review of the sufficiency of the evidence for the charge for which Du-bose was convicted provides adequate protection from juror irrationality or error.
 
 Chambers v. State,
 
 973 So.2d 266, 270-271(¶ 12) (Miss.Ct.App.2007). For the foregoing reasons, we find that the verdict is not against the overwhelming weight of the evidence.
 

 CONCLUSION
 

 ¶ 39. Finding that Dubose’s arguments are without merit for the foregoing reasons, this Court affirms the convictions and sentences.
 

 
 *353
 
 ¶ 40. THE JUDGMENT OF THE JASPER COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, GRATIFICATION OF LUST, AND SENTENCE OF TEN YEARS; COUNT II, GRATIFICATION OF LUST, AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY TO COUNT I; AND COUNT III, GRATIFICATION OF LUST, AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY TO COUNTS I AND II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JASPER COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Mississippi Code Annotated section 97-5-23(1) provides:
 

 (1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court.
 

 We note that the terms “molestation,” "touching,” and "fondling" may be used interchangeably, but regardless of the term used, Mississippi Code Annotated section 97-5-23 has been called the "gratification of lust” statute and/or the "unlawful touching” statute.
 
 Friley v. State,
 
 879 So.2d 1031, 1033 n. 4 (Miss.2004).
 

 [2]
 

 . To protect their identity, the names of the minor children will be referred to by initials.
 

 [3]
 

 . Sexual battery is defined by Mississippi Code Annotated section 97-3-95 (Rev.2006), and it provides in relevant part: (1)“A person is guilty of sexual battery if he or she engages in sexual penetration with: ... (d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child.”
 

 Dubose was also indicted on two counts of sexual battery, one against C.D. and one against A.D. During jury deliberations, the jury sent a note to the judge asking for a definition of sexual penetration in regard to the charge of sexual battery. In response, the judge informed the jury that the law prohibited him from giving them further instructions at that time. The jury found Dubose not guilty of the sexual battery charges.
 

 [4]
 

 . Dr. Tibbs's testimony pertaining to L.D.'s physical injury was met with an objection by Dubose’s counsel because Dubose was indicted for sexual battery of C.D. and A.D., not L.D. The objection was overruled.
 

 [5]
 

 . Dubose's brief to this Court slates that “[u]pon information and belief, Thigpen is the cousin of Quillie McDonald....”
 

 [6]
 

 . The record does not indicate where the two were classmates.